IN THE UNITED STATES DISTRICT COURT FOR THE FILED
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 JUN 22 PM 2: 54

U.S. DISTRICT COURT
N.D. OF ALABAMA

JAMES D. MASSEY; ROBERT A.     )
MASSEY,                        )
                               )
          Plaintiffs,          )
                               )
     v.                        )   CIVIL ACTION NO. 95-G-1405-S
                               )
CONGRESS LIFE INSURANCE COMPANY;)
INSURERS ADMINISTRATIVE        )
CORPORATION,                   )
                               )
          Defendants.          )

ENTERED

JUN 2 2 1998

## MEMORANDUM OPINION

**STATEMENT OF FACTS**

     Robert A. Massey and James D. Massey, brothers, are the
sole owners of Massey Amoco, Inc. located in the Centerpoint area
of Birmingham, Alabama.  In early 1993 Don Goldstein, an agent of
defendant Congress Life Insurance Company [hereinafter Congress],
met with the brothers and their two full-time employees Jonathan
Conway and Don Conway at the Massey business premises for the
purpose of investigating individual health insurance for the four
of them.



It was never the intent of **any** of the parties to this suit to enter into a small-employer health plan governed by the Employee Retirement Income Security Act, 29 U.S.C.A. § 1135 [hereinafter ERISA].  (Reliance on an ERISA defense did not come into the picture until suit was filed.)[1]  The application, **prepared and supplied by Congress** and **filled out by each** of the **four individuals,** included the following statement:

> I understand that I am applying for a medical insurance plan that is **not intended, by its issuer Congress Life Insurance Company, to be a small-employer health plan.** I am applying as an individual, and I recognize that Congress Life Insurance Company will individually evaluate (underwrite) my application.  I agree that if my application is accepted by Congress Life Insurance Company, a Certificate of Insurance will be issued to me, as an individual, and will in no way be linked to any employer/employee relationship (emphasis added).

All four voluntarily purchased Congress health insurance.  Defendant Insurers Administrative Corporation [hereinafter IAC], as agent for Congress, was responsible for handling the administration of the policies: sending premium notices, collecting premiums, and processing claims.

Massey Amoco, Inc. [hereinafter MAI] did not undertake any activities in the administration, benefits, and/or claims of the health insurance purchased by the individuals.  It received no consideration in any form from defendants or related to the

---

[1]  At no time did defendants ever issue a summary plan description or other information to participants or beneficiaries as required by 29 U.S.C.A § 1021 and § 1102.

insurance at issue.  MAI did not contribute to the premiums paid by Jonathan Conway and Don Conway.  Premium amounts were deducted from their paychecks and remitted to the defendants until the time they took other employment and elected to terminate their policies.

Premium payments for the Massey brothers were paid by MAI.  Insurance payments were not to be contributions by MAI for their benefit.  The Masseys intended for payments to be made from their salaries.  The payroll records and general ledger of MAI and financial statements and tax returns, however, indicate the corporation bore the expense of the premiums.[2]

Pertinent to the instant case is the section under Section VIII, GENERAL PROVISIONS, of the policies relating to payment of premiums, set forth below:

**PAYMENT OF PREMIUM AND GRACE PERIOD.**  All premiums falling due under the Policy, including adjustments thereof, if any, are payable directly to Our Authorized Administrator on or before their respective due dates. The payment of any premium shall not maintain the insurance in force beyond the day immediately preceding the next due date, except as otherwise provided herein.

If you have not previously given notice to Us that your coverage is to be terminated, a grace period of thirty-one (31) days, without interest charge, will be allowed for the payment of any premium due after the initial premium.  During this time your coverage under the Policy to which such premium applies shall continue in force.

---

[2]  The corporation deducted cost of insurance as an expense on its corporate tax returns, and the corporation's general ledger and income statement both refer to the insurance as "Group Health/Life" insurance.

3

> If the premium is not paid within the grace period,
> your coverage under the Policy to which such premium
> applies shall automatically terminate as of the due
> date of the unpaid premium.

The following similar statement appeared in the enroll-

ment application form:

> I understand and agree that I am responsible for making
> the proper monthly premium payments.  Furthermore, it
> is understood that a grace period of thirty-one (31)
> days is allowed for any premium after the first premium
> and that if the premium is not paid before the expira-
> tion of the thirty-one (31) day grace period, coverage
> for all insured persons shall lapse as of the premium
> due date.  Any negotiable premium remittance received
> in an envelope postmarked after the thirty-one (31) day
> grace period will be returned less any amounts due (if
> any) from the previous months.

For whatever reason, premium payments were not sent for

the month in which they were due in October 1994, a custom

allowed in previous months.  Evidence before the court shows that

the defendants had established a custom of accepting late pay-

ments on the policies.  Attachments to Plaintiff's Exhibit 4 to

Plaintiffs' Motion in Opposition to Defendant's Motion for

Summary Judgment and Motion to Strike Jury Demand show the

following notices sent by IAC, as agent of Congress, to Congress

policy holders:

Statement produced on James D. Massey March 15, 1993

|  |  |  |
|---|---|---|
| PAST DUE IN MONTH | 02-01-93 | $    .25 |
| PAST DUE IN MONTH | 03-01-93 | $100.70 |
| TOTAL DUE |  | $201.65 |

Statement produced on James D. Massey January 25, 1994

4

```
            PAST DUE IN MONTH        12-01-93  $   11.00

            PAST DUE IN MONTH        01-01-94  $   11.00

                  TOTAL DUE                    $  130.70
```

Statement produced on James D. Massey November 15, 1994

```
            Past due for             10/01/94  $    0.60

            Past due for             11/01/94  $  183.50

                  TOTAL DUE                    $  367.60
```

Statement produced on Jonathan W. Conway January 25, 1994

```
            PAST DUE IN MONTH        12-01-93  $    9.00

            PAST DUE IN MONTH        01-01-94  $    9.00

                  TOTAL DUE                    $   99.20
```

Statement produced on Robert A. Massey January 25, 1994

```
            PAST DUE IN MONTH        12-01-93  $   10.00

            PAST DUE IN MONTH        01-01-94  $   10.00

                  TOTAL DUE                    $  122.70
```

Statement produced on Robert A. Massey January 25, 1994

```
            Past due for             12/01/93  $   10.00

            Past due for             01/01/94  $   10.00

            Past due for             02/01/94  $  102.70

                  TOTAL DUE                    $  225.40
```

Congress continued the insurance in spite of late payments shown on the notices and accepted payment of noticed premiums. Coverage never lapsed. There had never been a reinstatement of the policies.

5

Plaintiff Robert Massey received a premium notice in late November 1994. Printed in bold print in an enclosed box at the bottom of the notice appeared the following wording:

**DELINQUENT NOTICE:**

**THE PAST DUE AMOUNT MUST BE RECEIVED WITHIN 31 DAYS OF THE DUE DATE FOR THE MONTH IN WHICH IT WAS DUE TO AVOID LAPSE OF COVERAGE.**

Immediately above the wording in the enclosed box in bold print was the following:

**IF PREMIUMS ARE NOT RECEIVED WITHIN 31 DAYS OF THE DUE DATE, COVERAGE WILL CEASE AS OF THE DUE DATE FOR NON-PAYMENT OF PREMIUM.**

Both phrases were part of the printed form.

In the center of the page appeared the following: "DUE DATE: 12/01/94." Approximately an inch beneath this wording the notice stated: "Past due for 11/01/94    $111.20." A total payment due was listed as $222.40.

Subsequent **typed** wording appeared on the top portion of the notice to be returned with the payment:

```
ROBERT A. MASSEY        TOTAL DUE:    $222.40
C/O MASSEY AMACO        DUE DATE:     12/01/94
2012 CENTER POINT RD    CASE NUMBER:  1A16001363
```

James Massey received a similar form premium notice. His showed a past due amount of $183.50 for 11/01/94. The following was typed on the top of his notice:

```
JAMES D. MASSEY         TOTAL DUE:    $367.60
C/O MASSEY AMMCO [SIC]  DUE DATE:     12/01/94
1012 CENTER POINT RD    CASE NUMBER   1A16001362
```

Plaintiffs remitted the above-noted premiums within thirty-one (31) days of the 12/01/94 due date which appeared in two places on each notice.

On or about December 12, 1994, defendants returned premiums paid by the Massey brothers pursuant to the above-quoted notice[3] and canceled the insurance policies.

Prior to the cancellation of the policies and during the time coverage was in effect, plaintiff James Massey was diagnosed with end stage renal disease in March 1994.  Defendants had knowledge of the disease prior to April 8, 1994, at which time they estimated the total amount of expenses they planned on paying at $62,500.00.  A thorough investigation on Mr. Massey was completed showing that on May 17, 1994, "NO PRE EX HAS BEEN FOUND ON ABOVE MENTIONED INSURED."[4]  Congress investigated or audited Mr. Massey on June 7, 1994, August 26, 1994, and December 5, 1994.

During the months of October and November 1994 James Massey incurred medical expenses in excess of the premiums owed on his health insurance policy.  His November expense for dialy-

---

[3]   The Conways were no longer employees of MAI.

[4]   INSURERS ADMINISTRATIVE CORPORATION INTEROFFICE REFERRAL. Defendants had Mr. Massey investigated by private investigator Kevin R. Pennell.  Mr. Pennell canvassed 14 hospitals and medical facilities in the Birmingham area plus six pharmacies near Mr. Massey's residence and the hospitals he had visited.  Mr. Pennell had found no hospitalization or treatment for this condition. Mr. Pennell verified that Mr. Massey had lived at the same address for the past seven years.

7

sis alone was $2,987.46.  By letter of December 13, 1994, IAC notified Mr. Massey that coverage was denied for services he had received during November.  The letter stated, in part, the following:

> Our eligibility records indicate that your policy did cancel effective November 1, 1994 which is prior to the dates of treatment and fees submitted to us by the provider.

Mr. Massey was left with no medical insurance and with no possibility of acquiring any.

Plaintiffs filed suit in the United States District Court for the Northern District of Alabama on June 2, 1995.  The case came before the court on the motion for summary judgment filed by defendants on February 27, 1996.  The court entered summary judgment sua sponte for insureds on the breach of contract claim and ordered reinstatement of the policies.  On interlocutory appeal the Eleventh Circuit held that the district court's failure to give sufficient notice to defendants that it might grant summary judgment for the insureds sua sponte precluded granting summary judgment for plaintiffs on their breach of contract claims.  The court vacated the injunction issued by the district court stating it rested on the "inappropriate grant of summary judgment," and in a footnote directed the district court to satisfy itself that it had jurisdiction over the controversy.  The circuit remanded the case.

Upon return of the case to the district court the court allowed plaintiffs to amend the complaint to satisfy the jurisdictional question raised. Thereafter, on September 11, 1997, plaintiffs filed a motion for partial summary judgment on the contract claim. On October 3, 1997, Congress and IAC filed a motion for summary judgment. Both motions are presently before the court.

I.

As a starting point in analyzing the issue before it the court must first decide whether the insurance policies purchased by the two MAI owners and their two employees constitute an "employee welfare benefit plan" as defined under the provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. [hereinafter ERISA]. The Eleventh Circuit has devised the following test to determine the existence of a plan:

> In determining whether a plan, fund, or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982).

In the instant case a reasonable person could ascertain that originally the benefits were those intended for the Massey brothers and the two MAI employees and that they were the beneficiaries. At the time of cancellation of the policies only the

9

Massey brothers, the sole owners of the business, had policies.
They were the intended beneficiaries.

ERISA defines an "employee" as "any individual employed
by an employer."[5]   An "employer" includes "any person acting
directly as an employer, or indirectly in the interest of an
employer, in relation to an employee benefit plan."[6]   An "em-
ployee benefit plan" is any plan established or maintained "by an
employer or employee organization."   Pursuant to 29 U.S.C. § 1135
the Department of Labor has promulgated regulations interpreting
the meaning of these terms.   The Department of Labor defines
"employee benefit plan" to exclude "plans without employees."
Pertinent language follows:

> [T]he term employee benefit plan shall not include any
> plan fund or program, other than an apprenticeship, or
> other training program, under which no employees are
> participants covered under the plan, as defined in
> paragraph (d) of this section.   For example, a so-
> called Keogh or H.R. 10 plan under which only partners
> <u>or only a sole proprietor</u> are participants covered
> under the plan <u>will not be covered under title I</u>.
> However, a Keogh plan under which one or more common-
> law employees, <u>in addition to the self-employed
> individuals</u> are participants covered under the plan,
> will be covered under title I.   (emphasis added).
> . . .
> An individual and his or her spouse shall not be deemed
> to be employees with respect to a trade or business,
> whether incorporated or unincorporated, which is wholly
> owned by the individual or by the individual and his or
> her spouse.

---

[5]   29 U.S.C. § 1002(6).

[6]   29 U.S.C. § 1002(5).

29 C.F.R. 2510.3-3(1992) (emphasis added).  See also, Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 264 (9th Cir. 1991) (The Ninth Circuit, in interpreting this regulation said: "[A] plan whose sole beneficiaries[7] are the company's owners cannot qualify as a plan under ERISA."); Kwatcher v. Mass. Service Emp. Pension Fund, 879 F.2d 957, 959 (1st Cir. 1989) (Sole shareholder who was employed by corporation he owned was "employer" for purposes of ERISA.); Swartz v. Gordan, 761 F.2d 864,867-69 (2nd Cir. 1985) (A plan with no employees is not an employee benefit plan.).

In Fugarino v. Hartford Life and Acc. Ins. Co., 969 F.2d 178 (6th Cir. 1992), cert. denied, 507 U.S. 966, 113 S. Ct. 1401, 122 L. Ed. 2d 774 (1993), the court held that the sole proprietor of a business does not fall within ERISA.  In discussing the pertinent regulations the court said:

> As a result of these regulations, a plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA.  ...  Further, an employer cannot ordinarily be an employee or participant under ERISA.  A fundamental requirement of ERISA is that "the assets of a plan shall never inure to the benefit of the employer...."  29 U.S.C. § 1103(c)(1).  Only "participants" and "beneficiaries" as defined by ERISA have standing to recover benefits under ERISA.  29 U.S.C. § 1132(a)(1).  ...  An "employee" and "employer" are plainly meant to be separate entities under ERISA. ...  Thus, a sole proprietor or sole shareholder of a business must be considered an employer and not an employee of the business for purposes of ERISA. (Citations omitted.)

---

[7]   Two brothers.  Exactly on point with the present case.

The Eleventh Circuit has promulgated a three-step test to determine whether an employee benefit plan has been established:  1) whether a plan exists; 2) if so, whether it is covered by the "safe harbor" established by the Department of Labor regulations pertaining to group insurance; and 3) whether, if the plan is outside the safe harbor, the employer's involvement is sufficient to have established or maintained the plan.

Obviously from the language of the applications no one intended that the policies sold to MAI were to constitute an ERISA plan.  Congress drafted the forms and submitted them to those working at MAI.  It is incongruous for Congress to seek escape from liability now by claiming that it sold an ERISA plan when its application form for the individual policies clearly sets forth that the "medical insurance plan ... is not intended, by its issuer Congress Life Insurance Company, to be a small-employer health plan."

In this instance equitable estoppel becomes a sword.  "In order to invoke the doctrine of equitable estoppel, the person seeking to assert estoppel must be materially harmed if the person against whom the doctrine is asserted is allowed to assert a claim inconsistent with its earlier position."  Stiegler v. Dittman, 584 So. 2d 507, 516 (Ala. 1991).  The Masseys, specifically James D. Massey, would be significantly harmed if Congress is allowed to invoke the doctrine of ERISA and insulate itself from state law claims.  The court in Mazer v. Jackson

12

Insurance Agency, 340 So. 2d 770, 772 (Ala. 1976), held "[t]he
purpose of equitable estoppel and promissory estoppel is to
promote equity and justice in an individual case by preventing a
party from asserting rights under a general technical rule of law
when his own conduct renders the assertion of such rights
contrary to equity and good conscience."  Equity and justice
mandate that Congress is estoped from pleading ERISA by its
representation that ERISA did not apply.  It is not honest at
this stage for defendants to maintain ERISA is applicable in an
attempt to avoid liability--a position more hypocritical than
that of the Pharisees of old.

　　　Even were the court to hold that an ERISA plan existed
at the time of the initial purchase of the policies because of
the existence of two Conway employees, those employees had long
since left MAI by the time of the policy cancellations.  The
"plan" would only be applicable to the two owners of MAI.

II.

　　　A second step in the analysis is whether the "plan"
falls within the safe-harbor provisions of the regulations found
in 29 C.F.R. § 2510.3-1(j).  Under the regulations ERISA does not
apply to a group or group-type insurance program under which:

1)　No contributions are made by an employer or employ-
　　ee organization;

2)　Participation in the program is completely volun-
　　tary for employees or members;

13

3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

The existence of any one of the above four factors prevents the "plan" from inclusion under ERISA coverage. Memorial Hospital System v. Northbrook Life Insurance Co., 904 F.2d 236, 241 n.4 (5th Cir. 1990).  See Kanne v. Connecticut General Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988), cert. denied, 492 U.S. 906, 109 S. Ct. 3216, 106 L. Ed. 2d 566 (1989).

At first glance it would seem that under this test MAI is not exempt from ERISA coverage because premium payments were made by the corporation.  Premiums for the Masseys were to come out of deductions from their individual pay.  Neither plaintiff knows how this was handled as an accounting matter since they are not accountants.  In Hensley v. Philadelphia Life Ins. Co., 878 F. Supp. 1465, 1471 (N. D. Ala. 1995), in discussing how insurance payments were made, the court stated: "This court does not find fatal to meeting the 29 C.F.R. § 2510.3-1(j) exception that a payroll deduction was not taken from Jones's paycheck before he

14

was paid his salary.  The methodology used by Massey[8] had the same effect as a payroll deduction."  Here, too, in light of the Ninth Circuit holding in Kennedy, 952 F.2d at 264, the First Circuit holding in Kwatcher, 879 F.2d at 959, and the Second Circuit holding in Swartz, 761 F.2d at 867-69, disallowing participation by sole shareholders in ERISA plans, the methodology by which the Masseys' premiums were paid is unimportant to the issue before the court.  The Masseys's accounting procedures have significance only in that they may owe money to the government for the manner in which the deductions were taken. Importantly, no contributions were made by the corporation on behalf of the Conways.

In Taggart Corp. v. Efros, 617 F.2d 1208 (5th Cir. 1980), cert. denied, 450 U.S. 1030, 101 S. Ct. 1739, 68 L. Ed. 2d 225 (1981), however, the court held that the bare purchase of an insurance policy does not, in and of itself, establish the existence of an ERISA plan.  ERISA does not regulate the purchase of health insurance if "the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits."  617 F.2d at 1211. Although Taggart was distinguished in Memorial Hospital System v. Northbrook Life Insurance Co., 904 F.2d 236, 241 n.4 (5th Cir. 1990), the distinction is not applicable in the case at bar.

─────────────────

[8] Ironically, same name as plaintiffs in instant case.

15

Both <u>Taggart</u> and the instant case involve the bare purchase of medical insurance policies administered by separate agencies. Defendants have argued that <u>Taggart</u> was limited by <u>Randol</u> <u>v. Mid-West Nat. Life Ins. Co. of Tennessee</u>, 987 F.2d 1547 (11th Cir.), <u>cert. denied</u>, 510 U.S. 863, 114 S. Ct. 180, 126 L. Ed. 2d 139 (1993), which cited <u>Donovan</u> <u>v. Dillingham</u>, 688 F.2d 1367, 1375 (11th Cir. 1982) (en banc), which limited <u>Taggart</u> to its facts (Participation in group health insurance was voluntary and the employer did not subsidize the purchase of the policy.).  The court distinguished <u>Randol</u> from <u>Taggart</u> by saying that <u>Randol</u> not only established a system for withholding premiums from employee wages and paying them directly to the carrier, **but also contributed** $75.00 per employee toward the monthly premium for the purpose of helping the employees obtain health insurance coverage.  The court held that such conduct constituted maintenance of a plan within the meaning of 29 U.S.C. § 1002(1).  Other than wages withheld no independent contributions from MAI were made.

Randol is further distinguished from the case at bar in that in the instant case the defendants have included specific language in their policy applications that the policies are **not** part of an ERISA plan, causing the Masseys's belief that their policies were not covered by ERISA and estopping defendants from furthering this argument.

16

As discussed previously in Kennedy, 952 F.2d 262 (9th Cir. 1991), the court held that "a plan whose sole beneficiaries[9] are the company's owners cannot qualify as a plan under ERISA." Kennedy was followed the next year by Fugarino, 969 F.2d 178 (6th Cir. 1992), which held that "[A] plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA."[10]

The regulations exclude from the definition of "employee" an "individual and his or her spouse" employed by a trade or business when one or both of them wholly owns the company. 29 C.F.R. § 2510.3(c)(1). By analogy, the provisions applicable to a husband/wife are applicable to brothers as the Ninth Circuit held. They fall within the safe harbor provisions of the act.

In Meredith v. Time Ins. Co., 980 F.2d 352 (5th Cir. 1993), the court held that an insurance plan purchased by a sole proprietor, covering only herself and her spouse, did not constitute an employee welfare benefit plan. The wife/husband arrangement did not fit the Department of Labor definition of an employee benefit plan which excluded plans without employees. The court held that "to constitute an ERISA plan, a plan must be established or maintained by an employer for the benefit of employees." State law claims against the insured were not pre-

---

[9]   Two brothers owned the business.

[10]   Statement was based on 29 C.F.R. § 2510.3-3(b) and 29 C.F.R. § 2510.3(c)(1) (1988), both of which are quoted in the body of the memorandum opinion. For a complete discussion of these cases see pages 10-11 of this memorandum opinion.

empted.   The Massey brothers had no employees.   Consequently, there was no "plan" established for the benefit of employees.

Based on <u>Kennedy</u>, <u>Taggart</u>, <u>Meredith</u>, <u>Fugarino</u> and the regulations, the court holds that the insurance policies purchased by James and Robert Massey did not constitute an ERISA plan.   The brothers are the owners of a business employing no employees.   In light of all the "surrounding circumstances" from the point of view of a "reasonable person," <u>Donovan</u>, 688 F.2d at 1373, the court holds that the purchase of individual medical policies by the Masseys does not fall within the parameters of an ERISA plan.   Accordingly, the defendants' motion for summary judgment on the ERISA argument is denied.

III.

Having held that ERISA is not applicable the court holds that plaintiffs' state law claims are validly filed and that defendants breached the contracts with the Masseys.

## A.   **SIMPLE CONTRACT**

This discussion is not one of ERISA at all, but creation of a contract and its breach.

The formation of a simple contract involves three things:   an offer, an acceptance, and consideration--elements discussed in the introductory chapter of all contract treatises and during the first days of "Contracts I" taught in all law schools.   Paul R. Conway, <u>Outline of the Law of Contracts</u>,

18

"Chapter I Introductory," [hereinafter Conway] at 7-8 (1968)

defines contract in the following manner:

    A.    CONTRACT DEFINED: **A contract is a legally binding promise or set of promises.**  It has also been variously defined as:

        (1)    "A bargain or agreement voluntarily made upon good consideration, between two or more persons capable of contracting, to do, or forbear to do, some lawful act."  <u>Justice v. Lang</u>, 1870, N.Y. 497, citing Comyn on Contracts.

        [2]    "A voluntary and lawful agreement, by competent parties, for a good consideration, to do or not to do a specified thing."  <u>Robinson v. Magee</u>, 1858, 9 Cal. 81 at 83.

        (3)    "An agreement upon sufficient consideration to do, or not to do a particular thing."  Blackstone's Commentaries, vol. 2, page 11.

        (4)    "A promise, or set of promises, to which the law attaches legal obligation."  Williston on Contracts, § 1.

        (5)    "A promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  Restatement of Contracts Second, § 1.

    B.    PROMISE: PROMISOR: PROMISEE: BENEFICIARY

        "(1) A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.

        "(2) The person manifesting the intention is the promisor.

19

"(3) The person to whom the manifestation is
addressed is the promisee.

"(4) Where performance will benefit a person
other than the promisee, that person is
a beneficiary."  Restatement of
Contracts Second, § 2.

Conway later defines and lists components of consider-
ation.  "Chapter V Consideration," at 147-48.

I.   **CONSIDERATION DEFINED.  Either the slightest legal
detriment suffered by one party at the request of
the other or the slightest legal benefit bargained
for and obtained by either party, will constitute
a consideration sufficient to support a contract.**

Consideration in unilateral contracts may take the form of (1) an

act, (2) a forbearance, or (3) the creation, modification or

destruction of a legal right.  A return promise is sufficient

consideration in bilateral agreements.

Congress offered simple insurance coverage to the

Masseys and the Conways.  Pursuant to that coverage it accepted

premiums on the policies even though payments at times were late.

The court rejects defendants' argument that the premiums were

timely paid, but in the wrong amount.  Premiums paid in the wrong

amount are **not** fully paid and are, therefore, evidence of a

practice of IAC's acceptance of premium payments outside the

grace period.  By accepting the late payments the defendants

misled plaintiffs into paying late and are thus bound by their

actions.  It is irrelevant whether the policies themselves stated

20

payment was to be received within a 31 day grace period.  It is

irrelevant that the Masseys understood the wording of the poli-

cies pertaining to payment within the grace period.  Each notice

sent by IAC amounted to an **interpretation** of the policies or

under a second scenario, to new formally written offers for

insurance to plaintiffs which ripened into contracts upon payment

of the premiums.[11] Rather than being sophisticated businessmen

plaintiffs are "gas pumpers" at best, only "shade tree mechan-

ics."  It is undisputed that the Masseys relied on the notices

and took them at face value.  Defendants put the total due on the

notices sent.  Had it been their intent to cancel the policies

they would not have put the premium for the second month on the

notice.  Insertion of the second month's premium on the notices

is evidence defendants had no intention of canceling the poli-

cies.  The notices can only be interpreted as clear statements of

defendants' intention not to cancel or, worse, indication of

their present intention to deceive the mechanics into detrimental

reliance on the notices, particularly with respect to the Novem-

ber 30, 1994, notice, sent Wednesday before the policies were

canceled five days later on Monday.

          In Nautech Marine Surveyors & Consultants Inc. v.

Provident Indem. Life, 1995 WL 92357 (E.D. La. 1995), Provident

sent a form letter to the plaintiff canceling his insurance for

---

[11]  The notices were sent a time when Congress was
maintaining that there was no ERISA plan.

nonpayment of the premium. Evidence revealed that premiums had

not been paid during the grace period on multiple occasions. The

court held that Provident was estopped from canceling the policy

for nonpayment of premiums. "Estoppel has been recognized if

there is a habit or custom of accepting late premiums on the part

of the insurer and the person insured reasonably believes that,

because of this habit or custom, the insurance company will keep

the policy in effect without timely premium payments." Nautech,

1995 WL 92357, 4 (E.D. La.); Cormier v. Lone Star Life Ins. Co.,

500 So. 2d 431 (La. App. 3rd Cir. 1986). The court held that

Provident, having accepted late premiums, had a duty to clearly

place the insured on notice that his insurance would be canceled

as of a certain date if the account was not brought current.

Provident had a duty to inform the insured that it would no

longer accept late payments. It could have corrected the problem

by letter giving notice that late payment would no longer be

tolerated.

Similarly, in Henson v. Celtic Life Insurance Company,

621 So. 2d 1268 (Ala. 1993), the court held that acceptance of

premiums by insurer after learning of a breach of condition or

ground for forfeiture normally constitutes waiver or estoppel.

In the instant case defendants had formed a pattern of accepting

late premiums from plaintiffs. Defendants had a duty to put them

on notice that they would no longer continue the practice. Couch

22

on Insurance 2d (Rev ed) § 32:374.  Couch specifically states the
following:

> Notice of the discontinuance of the custom is
> essential because if the conduct of an insurer has been
> such that an insured has a right to rely upon such
> conduct as between the parties that he could pay premi-
> ums after the actual maturity date, or expiration of
> days of grace, then such conduct becomes and is in law
> a waiver of that provision of the contract fixing an
> actual limit within which payment may be made, and the
> insured has a right to expect a continuation of the
> favors until he receives due and positive notice they
> will no longer be extended.

More importantly, the language of the premium notices
contained patent ambiguities.  The typed due date was clearly
indicated as December 1, 1994.  A December 5, 1994, payment was
clearly within the 31 day grace period.  Printed parts of a
contract are the chosen language of the drafting party.  Written
parts of the contract take effect over the printed ones if the
parts cannot be reconciled.  Couch on Insurance 2d (Rev ed)
§ 15:72.  Typewritten or stamped clauses control the printed
form.  Couch on Insurance 2d (Rev ed) § 17:73.  Thus, the type-
written December 1, 1994, due date controls the printed form.  By
typing in the second due date in the notice defendants waived the
claim to the earlier due date.

Even if this were not so, ambiguities are construed
against the drafter.  Couch states:

> [C]ourts have said that a contract of insurance couched
> in language chosen by the insurer is, if open to the
> construction contended for by the insured, to be con-
> strued most strongly, or strictly, against the insurer
> and liberally in favor of the contention of the in-

sured.  Ambiguous or doubtful language or terms, it is said, must be given the strongest interpretation against the insurer which they will reasonably bear, or conversely, that the meaning of the words used that is most advantageous to the assured should be adopted, for the courts are not inclined to permit the insurer to take advantage of any ambiguity, especially when the plaintiff's cause is meritorious and the defense is technical.  A better statement is that if an insurance contract is so drawn as to be equivocal, uncertain, or ambiguous, to require interpretation because fairly susceptible of two or more different, but sensible and reasonable, constructions, the one will be adopted which, if consistent with the objects of the insurance, is most favorable to the insured (footnotes omitted).

Couch on Insurance 2d (Rev ed) § 15:74.

Alabama courts have held to the rule that a contract is to be construed against the drafter. See Henson v. Celtic Life Insurance Company, 621 So. 2d 1268, 1271 (Ala. 1993) (The recognized rule in this state is that where a clause in an insurance contract is susceptible of two constructions, it will be construed liberally in insured's favor and strictly against insurer.).

Whether an agreement is ambiguous is a question of law for the trial court. Steward v. Champion Intern. Corp., 987 F.2d 732, 734 (11th Cir. 1993) (Under Alabama law, the determination of whether a contract is ambiguous is a question of law for the court); Royal Cup, Inc. v. Jenkins Coffee Service, Inc., 898 F.2d 1514, 1523 (11th Cir. 1990) ("Whether a contract is ambiguous is a matter of law for the court to decide."); Yu v. Stephens, 591 So. 2d 858, 859 (Ala. 1991); Terry Cove North Inc. v. Baldwin County Sewer Authority, Inc., 480 So. 2d 1171 (Ala. 1985);

Vainrib v. Downey, 565 So. 2d 647 (Ala. Civ. App. 1990).  Since
the decision of ambiguity is one of law for the court the affida-
vit of Dr. Roberts is stricken.  The court holds the contract
documents, i.e. notices, were ambiguous and should be construed
in favor of the insureds.

The court holds that plaintiffs' due date to submit
premiums was December 1, 1994.  Payment on December 5, 1994, was
within the grace period.  Defendants breached the contracts by
canceling them for nonpayment of premiums.

Not only did defendants breach the contracts they had
with the Massey brothers, they breached a special duty they had
to James Massey who was suffering from end stage renal failure.
In Cataldie v. Louisiana Health Serv. and Indem. Co., 456 So. 2d
1373 (La. 1984), the insurer revoked coverage for an insured's
daughter who had been diagnosed with brain cancer during the
policy period.[12]  The court opined it would be "unconscionable"
to allow an insurance company to wait until a risk had been
realized before canceling a policy."  Id. at 1376.  The language

---

[12]  Louisiana had a statute regulating cancellation of
insurance for a terminally ill person.  Although Alabama does not
have such a statute, the concept is nevertheless applicable.  The
court is not pleased that defendants argued that this court's
earlier opinion espousing a special duty to James Massey was
based on a Louisiana statute and Louisiana cases.  The opinion
clearly stated that Alabama had no such statute.  Furthermore,
the earlier opinion cited a 5th Circuit opinion (which originated
in Louisiana), as well as an Alabama case.  Regardless of the
origination of the Louisiana law cited, the concepts are
applicable to the instant case, and the concept of a special duty
to James Massey is clearly grounded in Alabama law.

of Cataldie was referred to in Gahn v. Allstate Life Insurance Company, 926 F.2d 1449, 1454 (5th Cir. 1991), with the court adding that an unconscionable cancellation would make "it impossible for the insured to obtain insurance from any other carrier."

Referring to an Alabama case Couch said the following:

An insurer cannot cancel a health policy during a sickness covered thereby, even though the policy expressly provides for cancellation without cause.

Couch on Insurance 2d (Rev ed) § 67:23 (noting Benefit Ass'n Ry. Employees v. Bray, 226 Ala. 444, 147 So. 640 (1933) ("When the sickness begins, while the policy is in force, the sick benefits then begin to accrue, and a policy cannot be avoided or canceled for nonpayment of premiums when the sick benefits unpaid are sufficient to discharge them.")).[13]   The Bray court further held:

---

[13] In Bray the court considered the case in which there was a controversy as to whether the paymaster had made the monthly insurance payments prior to the time the insured contracted pneumonia.   James D. Massey incurred covered expenses in at least the amount of $2,987.46 during the month of November 1994,-- expenses incurred during the grace period giving rise to the insurer's duty to off-set the costs.   Testimony of James D. Massey indicates that during **each** of the months October 1994 and November 1994, his medical expenses exceeded the premiums on his policy.   Defendants' representation that since they hadn't received the bills at the time of cancellation there was no duty to off-set is fallacious and contrary to the purposes of the non-forfeiture policy in Alabama.   Under defendants' interpretation that an insurance company could simply pay all the claims arising during the grace period and then terminate coverage would leave a seriously ill individual without the insurance coverage he purchased.   Defendants were well aware of James D. Massey's diagnosis and had estimated his anticipated covered costs at $62,500.00.

> There is a general rule that an insurance policy cannot be canceled by the insurance carrier for nonpayment of premiums when it has a credit to the insured of an amount equal to such premium otherwise unappropriated by the insured. ...
>
> It is also said to be contrary to the spirit of the contract of health insurance so to interpret a clause in the policy which permits its cancellation without cause as to authorize it to be done under such a provision during the illness covered by it ... (citations omitted).

Benefit Ass'n Ry. Employees v. Bray, 226 Ala. 444, 147 So. 640 (1933). See also Sparks v. Republic Nat'l Life Ins. Co., 132 Ariz. 529, 647 P.2d 1127, cert. denied 459 U.S. 1070, 103 S. Ct. 490, 74 L. Ed. 2d 632 (1982) (Provision of health insurance policy stating that obligation to pay benefits with respect to injuries already suffered terminated upon termination of insurance coverage for nonpayment of premiums was ambiguous and failed to communicate the nature of the limitations where the paragraph relied on by insurer was contrary and purported limitation was hidden under the title which was misleading).

Not only were defendants aware of Mr. Massey's illness months before the cancellation, they had estimated the amount the policy would pay and had been paying for his treatments.  The estimated amount had not been reached and there were sufficient sick benefits remaining to cover Mr. James Massey's treatments.  It was unconscionable for defendants to cancel his health insurance and place him in a situation in which he was unable to secure insurance coverage.  Defendants are responsible for

27

continued payments of benefits on his behalf up to the policy limitation amount.  This would be true even were an ERISA plan in effect.

## B. CONTRACT BY PROMISSORY ESTOPPEL

Closely aligned with basic contract law is the law of promissory estoppel--an independent basis for creation of a contract.  This discussion of contract, too, is not connected with ERISA at all.  In chapter 8.11, entitled "The Four Stages in the Evolution of Promissory Estoppel," at pages 40-41, Corbin notes that historically equity enforced "promissory estoppel" before bargained-for consideration was conceived.  In Mazer v. Jackson Ins. Agency, 340 So. 2d 770, 772 (Ala. 1976), the Alabama Supreme Court explained the purpose of both equitable[14] and promissory[15] estoppel[16] in the following manner:

---

[14]   Mazer, 340 So. 2d at 772, uses the definition of equitable estoppel found in 21 C.J. § 120 pp. 1117-18, which follows: "Equitable estoppel is 'based upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, *when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence.*  The doctrine of estoppel is far reaching in its effect, extending to real as well as personal estate, and **embracing almost every enterprise in which men may be engaged.'** (Italics supplied.)" (Emphasis added.)

[15]   Mazer, 340 So. 2d at 772-73, uses the definition of promissory estoppel found in Bush v. Bush, 278 Ala. 244, 245, 177 So. 2d 568, 578 (1964), which follows: "'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is

> (The purpose of both) is to promote equity and justice
> in an individual case by preventing a party from
> asserting rights under a general technical rule of law
> when his own conduct renders the assertion of such
> rights contrary to equity and good conscience.

A basic aspect of promissory estoppel is a **detriment** suffered by the aggrieved party who **relied** on the promise to his detriment. *See* Words and Phrases, "Promissory Estoppel." The detriment aspect is essential to promissory estoppel. <u>Robert Gordon, Inc.</u> <u>v.</u> <u>Ingersoll-Rand Co.</u>, 117 F.2d 654, 660-661 (C.C.A. 7 1941) (Justifiable reliance and irreparable detriment to the promisee are requisite factors among others necessary to enable promisee to rely upon the doctrine of "promissory estoppel.).

> B.   DISTINGUISHED FROM ESTOPPEL.   Ordinary estoppel is
> a misrepresentation of **existing fact**, which the
> misrepresentor knew, or reasonably should have
> known, would mislead the other party, and which
> does mislead him to his damage.   In promissory
> estoppel, the only **fact** represented is, possibly,
> that at the time the promisor made the promise he
> intended to fulfill it.   If true, as is usually
> the case, there is no misrepresentation.   Even if
> untrue, it is not the untruth of the promisor's
> original **intention** which injures the promisee, but
> the **promisee's reliance upon the promise itself.**

---

binding if injustice can be avoided only by enforcement of the promise.'"

[16]   Williston states the doctrine of promissory estoppel is "distinct from the ordinary equitable estoppel, since the representation is promissory, not a misstatement of an existing fact."   3 Williston on Contracts, sec. 689.

Foreseeable, justifiable reliance leading to a detriment is essential in a promissory estoppel case.  In _Times-Mirror Co. v. The Superior Court_, 3 Cal. 2d 309, 44 P.2d 547 (1935), the city of Los Angeles was estopped by its conduct from abandoning condemnation proceedings upon which the paper had relied in buying and building its new plant.  The four elements of promissory estoppel were present:  1) an express promise to do something; 2) reasonably foreseeable likelihood that the recipient of the promise would rely thereon; 3) justifiable and material reliance; and 4) inevitable injustice resulting unless the promise was enforced.

In determining whether the detriment suffered in reliance on the promise is sufficient to make the promise enforceable, Corbin, at 26, poses the following questions:

1)   Was the conduct of the promisee actually induced, in part or in whole, by the promise?

2)   Was the action or forbearance substantial, constituting a material change of position by promisee?

3)   Did the promisor desire or request it, even though not offering the promise in exchange for it?

4)   Did the promisor have reason to foresee such action or forbearance as a probable result of the promise?

5)   Was the promised performance costly or difficult?

6)   What ratio does the cost or value of the conduct in reliance bear to that of the promised performance?

7)   In the light of the answers to the foregoing questions, what remedy, if any, will be just and equitable?  Should it be (1) _Full Money Damages_,

measured by the value of the promised performance
and the foreseeable injury resulting from non-
performance (expectation damages), or (2)
*Restitution*, measured by the promisor's own unjust
enrichment, or (3) *Reliance Damages,* reimbursement
of the expenditures and losses incurred by the
promisee with the value of the promised perform-
ance the maximum that is recoverable, or *Specific
Performance*?

The historical development of equitable estoppel has
seen the doctrine used in four stages:  1) an estoppel stage (to
promote equity and justice); 2) a contract stage (courts applying
promissory estoppel as a consideration substitute to validate and
enforce promises and awarding contractual expectation damages);
3) tort stage (independent of contract centering on promisee's
right to rely); and 4) equity stage (used during 1980's and
1990's to rectify wrongs with corrective relief).  Corbin at 45-
58.

The Fifth Circuit, in <u>Nimrod Marketing (Overseas) Ltd.
V. Texas Energy Investment Corp.</u>, 769 F.2d 1076, 1080 (5th Cir.
1985), <u>cert. denied</u>, 475 U.S. 1047, 106 S. Ct. 1266, 89 L. Ed. 2d
575, and <u>cert. denied</u>, 476 U.S. 1104, 106 S. Ct. 1948, 90 L. Ed.
2d 357 (1986), stated the following:

Promissory estoppel is an equitable form of action in
which equitable rights alone are recognized.

According to Corbin, at 57, the primary equitable right is the
promisee's right to rely.  In his discussion of equitable
estoppel, Corbin further stated:

With their reliance sabers, courts award the full range
of remedies based on specific performance, restitution,

31

> expectation, reliance, exemplary (seldom),[17] or some
> other appropriate relief to achieve corrective justice
> between the parties in the context of their distinct
> litigation.

Corbin at 57.

As he examined the equitable estoppel doctrine Corbin

referred to <u>Hoffman</u> <u>v.</u> <u>Red Owl Stores</u>, 26 Wis. 2d 683, 701-02,

133 N.W. 2d 267, 276-77 (1965), a portion of which is set forth

below:

> Where damages are awarded in promissory estoppel ...,
> they should be only such as in the opinion of the court
> are necessary to prevent injustice.   ...   In determin-
> ing what justice requires, the court must remember all
> of the powers, derived from equity, law merchant, and
> other sources, as well as the common law.  Its decree
> should be molded accordingly.

<u>Id.</u>

Corbin noted that several imponderables should be taken

into consideration in reaching a just decision.

> When a plaintiff's recovery is predicated on findings
> of a promise and detrimental reliance thereon, there is
> no fixed measure of damages to be applied to every
> case.  Rather, the amount of damages should be tailored
> to fit the facts of each case and should be only that
> amount which justice requires.

<u>Id.</u> at 58.

The equitable principle of promissory estoppel, as

outlined above, has long been recognized in Alabama.   <u>Johnson</u> <u>v.</u>

<u>Blair</u>, 132 Ala. 128, 31 So. 92 (1901).  In 1976 in <u>Mazer</u> <u>v.</u>

---

[17]   <u>Greenstein</u> <u>v.</u> <u>Flatley</u>, 19 Mass. App. Ct. 351, 358, 474
N.E.2d 1130, 1134 (1985) (Court applied promissory estoppel to
award both punitive damages and expectation damages of equal
amount regarding an office lease).

Jackson Ins. Agency, 340 So. 2d 770 (Ala. 1976), the Alabama
Supreme Court opined that an offer is not the basis of promissory
estoppel unless there is foreseeable detrimental reliance upon
it.  The court stated:

> An express promise is not necessary to establish a
> promissory estoppel.  It is sufficient that there be
> promissory elements which would lull the promisee into
> a false sense of security.

340 So. 2d at 774.

In another context Alabama courts have used promissory
estoppel as an independent equitable theory of relief for grant-
ing reliance damages.  Graddick v. First Farmers and Merchants
National Bank of Troy, 453 So. 2d 1305, 1310 (Ala. 1984) (re-
ferred to elements of promissory estoppel as stated in Dobbs,
Remedies § 2.3 (1973)).

It is emphasized that this entire discussion has
nothing whatever to do with ERISA, nor with estoppel cases having
to do with amendment of an ERISA plan by estoppel.  In this
discussion we are considering the creation of the original non-
ERISA state-law contract between parties not even bound by an
ERISA plan, and the creation of new contracts with the acceptan-
ces of each premium notice.  Under either scenario the Massey
brothers purchased individual insurance policies not intended to
be within an ERISA plan.  Their reliance on IAC's interpretation
of the policies as set forth in the notices sent was sufficient

33

to have caused contracts by promissory estoppel to have been formed under Alabama law.

C. **CONTRACT BY RESTATEMENT (SECOND) OF CONTRACTS**

A third type of contract is one that moves beyond promissory estoppel in an effort to avoid injustice through the use of Restatement (Second) of Contracts § 90 language. Although section 90 includes estoppel it is not entirely or solely an estoppel doctrine, for section 90 does not always require consideration, a promise, a misrepresentation of an existing fact, or reliance on such, nor even an intention not to keep a promise. The bid cases, discussed below, provide a good example of how section 90 can and does extend beyond traditional principles of promissory estoppel. As the discussion shows, Alabama has embraced first, traditional promissory estoppel principles and also section 90's extension and broadening effect.

Since 1976 Alabama has incorporated Restatement (Second) of Contracts § 90, as part of its evolving common law. Mazer, 340 So. 2d at 773 (referring to Johnson v. Blair, 132 Ala. 128, 31 So. 92 (1901)). Mazer quotes the definition of promissory estoppel (section 90) found in Bush v. Bush, 278 Ala. 244, 245, 177 So. 2d 568, 578 (1964). By defining promissory estoppel as being covered within section 90 language Mazer is thus both a promissory estoppel case as well as a section 90 one. Mazer stands for the principle of promoting equity and justice in instances in which the conduct estopped is both inequitable and

34

unjust.  See Cantrell v. City Federal Sav. & Loan Ass'n, 496 So.
2d 746, 751 (Ala. 1986) (quoted and applied Restatement (Second)
of Contracts § 90(1)).  Alabama has applied the doctrine as a
consideration substitute for awarding expectation damages.  See
Pinkston v. Hartley, 511 So. 2d 168 (Ala. 1987) (easement by
estoppel); Smith v. Norman, 495 So. 2d 536 (Ala. 1986); Mazer v.
Jackson Ins. Agency, 340 So. 2d 770, 772 (Ala. 1976).

        The court has turned to the Restatement (Second) of
Contracts § 90 (1981), set forth below, published by the American
Law Institute.  "The Institute's purpose was to clarify, simplify
and make contract law more certain by stating precisely and
clearly the principles and rules of the common law in light of
court decisions."  3 Eric Mills Holmes, Corbin[18] on Contracts
§ 8.10 entitled "Restatement (Second) of Contacts § 90 and Other
Sections Adopting the Conduct in Reliance Doctrine" (Joseph M.
Perillo, ed. Revised Edition 1996) [hereinafter Corbin] at 35.

        The Restatement section uses the following language:

> (1)  A promise which the promisor should reasonably
> expect to induce action or forbearance on the part of
> the **promisee or a third person** and which does induce
> such action or forbearance is binding if injustice can
> be avoided only by enforcement of the promise.  **The
> remedy granted for breach may be limited as justice
> requires** (emphasis added).

---

[18]  Arthur L. Corbin acted as "Consultant" to the ALI in
its pursuit.  He approved the revisions to Section 90 of the
Restatement

Restatement (Second) of Contracts § 90. Promise Reasonably Inducing Action or Forbearance (1981).[19]

> Comments to the Restatement further state:
>
> b. *Character of reliance protected.* The principle of this Section is flexible. The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. ...
>
> d. *Partial enforcement.* A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. ...
>
> e. *Gratuitous promises to procure insurance.* This Section is to be applied with caution to promises to procure insurance. The appropriate remedy for breach of such a promise makes the promisor an insurer, and thus may result in a liability which is very large in relation to the value of the promised service. ... Such difficulties (reliance or promise to use reasonable efforts) may be removed if the proof of the promise and the reliance are clear, or if the promise is made with some formality, or if part performance or a commercial setting or a potential benefit to the promisor provide a substitute for formality.

RESTATEMENT (SECOND) OF CONTRACTS § 90 cmt. b, d, and e (1981).

---

[19] Section 90 is distinguished from ordinary estoppel ("a misrepresentation of an **existing fact**, which the misrepresentor knew, or reasonably should have known, would mislead the other party," and did, in fact, do so). In a section 90 type situation "it is not the untruth of the promisor's original intention which injures the promisee, but the **promisee's reliance upon the promise itself.**" Conway, "Chapter VI Contracts Without Consideration," at 248 (1968).

Corbin at chapter 8.2, at 8, points out that section 90, a doctrine for reliance on a promise, is consistent with both historical development and current definitions (title of section).[20]  Under this doctrine "[c]onsideration is something done, forborne, or suffered, or promised to be done, forborne, or suffered by the promisee in respect of the promise."[21]  Historically in assumpsit actions courts have been familiar with the idea of reliance on a promise as a reason for enforcement. Corbin, at 9 n.2, directing attention to James Barr Ames, History of Assumpsit, 2 Harv. L. R. 1, 53 (1889).

Succinctly stated:  Section 90 replaces the need for consideration with detrimental reliance.  Corbin sees no conflict with the necessity for consideration and its evolution into section 90.

The bid cases exemplify contracts formed within the framework of this doctrine.

---

[20]  The principle enunciated in section 90 has long been recognized in Alabama jurisprudence.  Mazer, 340 So. 2d at 773 (referring to Johnson v. Blaie, 132 Ala. 128, 31 So. 92 (1901). Mazer quotes the definition of promissory estoppel (section 90) found in Bush v. Bush, 278 Ala. 244, 245, 177 So. 2d 568, 578 (1964).  By defining promissory estoppel as being covered within section 90 language Mazer is thus both a promissory estoppel case as well as a section 90 one.  Mazer stands for the principle of promoting equity and justice in instances in which the conduct is both inequitable and unjust.

[21]  This statement "used by Sir William Anson in his work on Contracts is taken chiefly from an opinion in the case of Currie v. Miss, L.R. 10 Exch. 162 (1875)."  Corbin, at 8 n.2.  The quoted material in the body of the opinion is found in Corbin § 8.2 at pg. 8.

In <u>Janke Construction Co., Inc.</u> v. <u>Vulcan Materials
Co.</u>, 386 F. Supp. 687 (W.D. Wis. 1974), <u>aff'd</u>, 527 F.2d 772 (7th
Cir. 1976), the court held that the doctrine of promissory
estoppel is applicable to construction bid cases in order "to
avoid injustice." 389 F. Supp. at 697.  The court stated: "'It
is only right and just that a promise a promisor knows will
induce action of a substantial character be enforced if it is in
fact relied on.'" <u>Id.</u> at 684 (quoting <u>E.A. Coronis Associates</u> <u>v.</u>
<u>M. Gordon Const. Co.</u>, 90 N.J. Super. 69, 216 A.2d 246, 251, 3 UCC
Rep. Serv. 42 (N.J. Super. A.D., Jan. 12, 1966) (No. A-1005)).
<u>Janke</u>, at 694 refers to <u>Drennan</u> <u>v.</u> <u>Red Star Paving Company</u>, 51
Cal. 2d 409, 333 P.2d 757 (1958), as the best expression of the
rationale for application of promissory estoppel in construction
bid cases.  In <u>Red Star</u> a subcontractor (defendant) used an oral
bid for work on a school project on which the general contractor
(plaintiff) was bidding.  Since the defendant's bid was the
lowest the plaintiff used that bid in submitting his bid on the
project.  Although plaintiff was the successful bidder the
defendant informed him the next day that it would not do the work
at the quoted price.  In using promissory estoppel to prevent the
defendant from revoking its stated bid the California Supreme
Court in <u>Red Star</u>, 333 P.2d at 760, stated the following:

> " ...The very purpose of section 90 is to make a prom-
> ise binding even though there was no consideration 'in
> the sense of something that is bargained for and given
> in exchange.' (See 1 Corbin, Contracts 636 et seq.)
> Reasonable reliance serves to hold the offeror in lieu

of the consideration ordinarily required to make the
offer binding.

. . .

      "When plaintiff used defendant's offer in
computing his own bid, he bound himself to perform in
reliance on defendant's terms.  Though defendant did
not bargain for this use of its bid neither did
defendant make it idly, indifferent to whether it would
be used or not.  On the contrary it is reasonable to
suppose that defendant submitted its bid to obtain the
subcontract.  It was bound to realize the substantial
possibility that its bid would be the lowest, and that
it would be included by plaintiff in his bid.  It was
to its own interest that the contractor be awarded the
general contract; the lower the subcontract bid, the
lower the general contractor's bid was likely to be and
the greater its chance of acceptance and hence the
greater defendant's chance of getting the paving
subcontract.  Defendant had reason not only to expect
plaintiff to rely on its bid but to want him to.
Clearly defendant had a stake in plaintiff's reliance
on its bid.  Given this interest and the fact that
plaintiff is bound by his own bid, it is only fair that
plaintiff should have at least an opportunity to accept
defendant's bid after the general contract has been
awarded to him.

386 F. Supp. at 694.  *See also* Montgomery Industries Intern.,

Inc. v. Thomas Const. Co., Inc., 620 F.2d 91 (5th Cir. 1980) (A

subcontractor who submits a bid to a general contractor, knowing

the general contractor is going to rely on its bid in submitting

the general bid, is bound unless it is clearly shown that the

subcontractor's bid offer was not final.); Air Conditioning Co.

of Hawaii v. Richards Const. Co.-Kaneohe Bay Project, 200 F.

Supp. 167 (D.C. Hawaii 1961), aff'd, 318 F.2d 410 (9th Cir. 1963)

(When bid was intended to induce action of a definite and sub-

stantial character on the part of the promisee, the court held
the promisor to the promise.).

## D.  **SUMMARY CONTRACT LAW IN ALABAMA**

Based on the above discussion the court holds that a
contract was formed between plaintiffs and defendants under
simple contract law, contract law based on promissory estoppel,
and contact law based on section 90, each of these independently.
There are therefore three separate and distinct reasons in law to
hold defendants liable for breach of contract.

IV.

Since the court has ruled that this case does not fall
under ERISA, state law claims are not exempt.  The court holds
that defendants are due summary judgment as a matter of law on
the bad faith claim.  The elements of the claim are not present:
1) breach of an insurance contract between the parties; 2) an
intentional refusal to pay the insured's claim; 3) the absence of
any reasonable legitimate or arguable reason for that refusal;
4) the insurer's actual knowledge of the absence of any legiti-
mate or arguable reason; and 5) if the intentional failure to
determine the existence of a lawful basis is relied upon, the
plaintiff must prove the insurer's intentional failure to deter-
mine whether there is a legitimate or arguable reason to refuse
to pay the claim.  National Sec. Fire & Cas. Co. v. Bowen, 417
So. 2d 179, 183 (Ala. 1982), appeal after remand, 447 So. 2d 133
(Ala. 1983).  The court believes defendants had an arguable legal

40

or factual defense to the insurance claim.  As such, they are not guilty of bad faith.  For the same reasons, the court holds that defendants are due summary judgment as a matter of law on the claims for negligence and outrage.  There is no indication that defendants were negligent in their handling of the claims and there is no basis for a claim of outrage.

V.

Having discussed equitable estoppel as a recognized contract doctrine in Alabama, the court moves its discussion to the use of equitable estoppel[22] as an **alternative** ground for relief under ERISA,[23] turning to the manner in which the Eleventh Circuit has dealt with equitable estoppel in an ERISA context.  At issue in National Companies Health Benefit Plan <u>v.</u> St. Joseph's Hospital of Atlanta, 929 F.2d 1558 (11th Cir. 1991), was the ERISA provision allowing an employer to terminate continua-

---

[22]  29 U.S.C.A. § 1001 (a) expresses the congressional findings and declaration of ERISA: "[I]t is therefore desirable in the interests of employees and their beneficiaries ... that minimum standards be provided assuring the **equitable** character of such plans and their financial soundness."  Under section 1001(b) congress declared ERISA was to protect ERISA beneficiaries by vesting of accrued benefits.

29 U.S.C.A. § 1132(a)(3) states that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) **to obtain other appropriate equitable relief** (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan (emphasis added).

[23]  This holding is applicable **only if** the contract holdings are not upheld.

41

tion coverage due to "[g]roup health plan coverage."  The court
stated the following:

> [S]ince continuation coverage is, by operation of law,
> part of every ERISA plan, an ERISA-plan sponsor's
> representations to its employees as to the meaning of
> COBRA's and the Tax Reform Act's amendments to ERISA is
> an **interpretation** of a provision of the plan itself.
> Thus, if the ERISA provider misinforms its employee
> about his rights to continuation coverage, and the
> employee relies on that misinformation to his
> detriment, the provider will be held liable under the
> equitable doctrine of estoppel (emphasis added).

929 F.2d at 1566.

The same opinion at 929 F.2d 1571, 1572, reiterated the
principle that ERISA preempts all state common law claims relat-
ing to employee benefit plans, including equitable estoppel
claims, but went further to hold the following:

> "Federal courts possess the authority, however, to
> develop a body of federal common law to govern issues
> in ERISA actions not covered by the act itself."  Kane,
> 893 F.2d at 1285.[24]  In Nachwalter v. Christie, 805
> F.2d 956, 960 (11th Cir. 1986), this court held that
> the federal common-law claim of equitable estoppel is
> not available to plaintiffs in cases involving oral

---

[24]  Kane v. Aetna Life Insurance, 893 F.2d 1283 (11th Cir.
1990), cert. denied, 498 U.S. 890, 111 S. Ct. 232, 112 L. Ed. 2d
192 (1990).  The court held that ERISA did not preempt employee's
equitable estoppel claims, to the extent of holding the insurer
to its agent's **interpretation** of ambiguous terms in the plan.
"Federal courts possess the authority, however, to develop a body
of federal common law to govern issues in ERISA actions not
covered by the act itself."  893 F.2d at 1285.  The court agreed
with the appellant that the federal common law of equitable
estoppel applied because the representations made by Aetna to
Mrs. Kane and the hospital were **interpretations** of an ambiguous
provision of the plan, not modifications.  893 F.2d at 1285.  The
court held Aetna was acting by and through its duly authorized
representative.  In the case at bar Congress was acting by and
through its agent IAC and is held to the IAC **interpretation** of
the due dates for payment of premiums.

amendments to or modifications of clear terms of em-
ployee benefit plans governed by ERISA.

. . .

The court (in <u>Kane</u>) held that the federal common-law
claim of equitable estoppel may be applied when an
employee relies, to his detriment, on an **interpretation**
of an ambiguous provision in a plan by a representa-
tive[25] of that plan.[26]   <u>Kane</u>, 893 F.2d at 1286.   An
ambiguous provision is one about which "reasonable
persons could disagree as to [its] meaning and effect
(emphasis added)."

    <u>National Companies Health Benefit Plan</u> v. <u>St. Joseph's</u>

<u>Hospital</u>,[27] 929 F.2d 1558 (11th Cir. 1991), dealt with the issue

of whether Robert Hersh and his dependents covered by an ERISA

group health plan had coverage after his resignation from

---

[25]   The ambiguous terms in the IAC notices set forth on
pages 6-7 are susceptible to differing interpretations,
especially in view of the history of acceptance of late payments.

[26]   After assurances by Aetna that the Southern Bell
Employee Medical Benefit Plan which covered Mr. Kane would cover
an infant born prematurely with severe medical complications, the
Kanes adopted the child.   The Kanes did not have a copy of the
plan.   When Mrs. Kane called the Macon, Georgia, office of Aetna,
which administered the plan for Southern Bell, the Aetna agent
informed her the child would be covered from the date of the
commencement of formal adoption proceedings.   An Aetna agent also
told the hospital the medical expenses of the child would be
covered under the plan beginning June 1, 1984.   The child
remained in the hospital until July 5, 1984.   Aetna denied the
claims when filed, claiming that formal adoption proceedings did
not begin until after the child was hospitalized and it was not
obligated to pay the claims where hospitalization began prior to
coverage.   The Kanes sued claiming equitable estoppel and
wrongful denial of a claim.

[27]   The holding in <u>St. Joseph's</u> was limited to
**interpretations** of ambiguous provisions.

43

National Distributing Company. Several months following his resignation Mrs. Hersh gave birth to premature twins who required extensive medical care. The district court's holding in favor of the Hershes and St. Joseph's was affirmed by the circuit which held: (1) an ERISA provider is not required to offer continuation coverage to an employee or his dependents who are covered under a preexisting group health plan at the time of the employee's termination; and (2) if ERISA provider *misinforms* the employee about his right to continuation coverage and the *employee relies* on that information, the provider will be held liable under the doctrine of estoppel. Mr. Hersh had not only relied on the representations made to him in the continuation coverage agreement he signed, but on a memorandum describing the continuation coverage. Similarly, the Masseys relied on defendants' custom of having accepted late premium payments, as reflected in the notices, thus invoking the estoppel doctrine.

The St. Joseph's court awarded damages, attorneys' fees,[28] and prejudgment interest and awarded injunctive relief. The carrier was required to assume its role as primary insurer for Mr. Hersh and his children. It was required to assume all unpaid medical expenses, and to reimburse all medical expendi-

---

[28] ERISA provides that "[i]n any action under this sub-chapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

tures Mr. Hersh had had to pay.  National was estopped from
disclaiming its obligation of providing the Hershes continuing
coverage for thirty-six months.

The St. Joseph's court set forth the elements of
equitable estoppel as defined by "federal common law" to be as
follows:

> (1) the party to be estopped misrepresented material
> facts; (2) the party to be estopped was aware of the
> true facts; (3) the party to be estopped intended that
> the misrepresentation be acted on or had reason to
> believe the party asserting the estoppel would rely on
> it; (4) the party asserting the estoppel did not know,
> nor should have known, the true facts; and (5) the
> party asserting the estoppel reasonably and detrimen-
> tally relied on the misrepresentation.

929 F.2d at 1572.

In awarding attorneys' fees and costs the St. Joseph's
court opined the court should consider the following:

> "(1) the degree of the opposing parties' culpability or
> bad faith; (2) the ability of the opposing parties to
> satisfy an award of attorney's fees; (3) whether an
> award of attorneys' fees against the opposing parties
> would deter other persons acting under similar circum-
> stances; (4) whether the parties requesting attorneys'
> fees sought to benefit all participants and beneficia-
> ries of an ERISA plan or to resolve a significant legal
> question regarding ERISA itself; and (5) the relative
> merits of the parties' positions."[29]

---

[29]   In material following the quoted material the court
stated that no one of the factors is necessarily decisive, and
some might not apply in a given case.   929 F.2d at 1575.

929 F.2d at 1575 (quoting Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 n.18 (5th Cir. 1980).[30]  Ironically, in the pending case upon looking at its relative merits ((5) above), the defendants are subject to liability.

The St. Joseph's court reasoned that if National did not have to pay attorneys' fees, it would only be liable for what it should have paid before the litigation began.  In a strongly worded opinion the court stated:

> With nothing to lose but their own litigation costs, other ERISA-plan sponsors might find it worthwhile to force underfinanced beneficiaries to sue them to gain their benefits or accept undervalued settlements. Assessing attorneys' fees against National will make it, and other ERISA-plan sponsors, less likely to make representations to beneficiaries concerning their group health coverage and then to attempt to renege on their obligations; furthermore, ERISA-plan sponsors will be motivated to inform beneficiaries quickly of their rights when Congress amends ERISA.

929 F.2d at 1575-76.

Although Alabama does not recognize the tort of negligent misrepresentation recognized in Lordmann Enterprises, Inc. v. Equicor, Inc., 32 F.3d 1529 (11th Cir. 1994), cert. denied, 116 S. Ct. 335, 133 L. Ed. 2d 234 (1995), Lordmann is important to the pending case for its discussion of equitable estoppel. The Lordmann court notes the Eleventh Circuit has recognized a

---

[30]   The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981, in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

46

federal ERISA claim for equitable estoppel **when a plan adminis-
trator makes a representation that interprets,** rather than
modifies, an ambiguous term of the plan. 32 F.3d at 1534 (refer-
ring to <u>Alday v. Container Corp. of America</u>, 906 F.2d 660, 666
(11th Cir. 1990), <u>cert</u>. <u>denied</u>, 498 U.S. 1026, 111 S. Ct. 675,
112 L. Ed. 2d 668 (1991)); <u>Kane v. Aetna Life Ins.</u>, 893 F.2d
1283, 1285 (11th Cir), <u>cert</u>. <u>denied</u>, 498 U.S. 890, 111 S. Ct.
232, 112 L. Ed. 2d 192 (1990).

In <u>Novak v. Irwin Yacht and Marine Corp.</u>, 986 F.2d 468
(11th Cir. 1993),[31] the court held that equitable estoppel did
not apply because ERISA's exclusion of oral modifications of
employee benefit plans allows estoppel to apply only to ambiguous
provisions of the plan, but stated:

> [W]e may apply equitable estoppel when the representa-
> tions made were **interpretations,** not modifications, of
> the plan.  ...  For a representation to be an inter-
> pretation of a plan, the relevant provisions of the
> plan must be ambiguous, that is to say, "reasonable
> persons could disagree as to [the provisions'] meaning
> and effect." <u>Id.</u> (Citing <u>Kane</u>, 893 F.2d at 1285.)
> (Emphasis added.)

986 F.2d at 472. The <u>Novak</u> court ruled that the provisions of
the plan at issue there were not ambiguous.

In <u>Hudson v. Delta Air Lines, Inc.</u>, 90 F.3d 451 (11th
Cir. (Ga.) 1996), <u>cert</u>. <u>denied</u>, 117 S. Ct. 1082, 65 U.S.L.W. 3584

---

[31] Novak was a participant in a group health plan
administered by his former employer. He filed suit alleging
violations of ERISA, seeking recovery for unpaid medical
expenses.

47

(1997), retirees brought suit against the airline for breach of ERISA and a state law contract claim pursuant to 28 U.S.C. § 1367[32] which empowers the federal court to hear supplemental claims.  <u>Hudson</u> was before the court as an ERISA case.  The question was whether the court was empowered to adjudicate the state law contract claim.  In discussing its supplemental jurisdiction the court said: "The court's power to adjudicate Count V[33] therefore turns on whether the state law cause of action alleged therein is so related to an ERISA ground that they form part of the same case or *controversy*."  <u>Id.</u> at 455.  The circuit agreed with the district court that Count V did not arise from the same controversy as the ERISA claims because flight privileges were not part of the ERISA benefits package.  The court affirmed the dismissal of Count V because there was not sufficient nexus between the state and federal claims.  In the case at bar, however, defendants' conflicting **interpretation** of

---

[32]  "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  ..."  28 U.S.C. § 1367(a).

[33]  Count V of the complaint alleged a suit for breach of contract under Georgia law.  The claim was predicated upon allegations that Delta made repeated promises to the plaintiffs during their employment that retirees who were at least 52 years old and had worked for Delta for at least ten years would be entitled to certain flying privileges throughout their retirement.

the Masseys' health care coverage as originally being simple
insurance contracts and later falling under an ERISA plan, bring
the state law breach of contract claim within the parameters of
this court's jurisdiction.  Both positions (contract and ERISA)
arise from precisely the same set of facts.

Under the Hudson ERISA contract claim, the court held
that the merits of the claim depended on evidence of the bilat-
eral contract.  "This will require proof of *written* plan
documents which notified the putative class that the terms of
their medical benefits plan would remain constant throughout
their retirement if they retired on or before January 1, 1993."
90 F.3d at 457.  The court referred to dicta in Alday, 906 F.2d
at 666 n.15, in which it said:

> ERISA fiduciaries might not be insulated from liability
> on the basis of the formal written plan documents where
> contradictory and fraudulent promises are made in
> informal communications for the purpose of deceiving
> employees with respect to their benefits.

90 F.3d at 458.  By analogy, in the instant case, if the policies
are held to be ERISA plans, defendants are not insulated from
liability on the basis of "informal communications," as in Alday,
but on the **formal written premiums notices** sent by IAC to
plaintiffs.

Pertinent portions of the ERISA statute, as set forth
previously in footnote 22 of this opinion on page 41, shows that
the intent of Congress was that equitable principles apply.  It

49

defies equity and good conscience to let the defendants create an ambiguity between the premium notices and the policies and not be bound by that ambiguity. As set forth by statute, Congress intended ERISA cases, equitable in nature, to be heard by equity courts applying the concepts of "equity," not "inequity." <u>See</u> <u>St. Paul Fire and Marine Ins. Co. v. Cox</u>, 583 F. Supp. 1221, 1227 (N.D. Ala. 1984), <u>aff'd</u> 752 F.2d 550 (11th Cir. 1985), ("Equitable principles that prevent a criminal from retaining the benefits of his wrongful conduct should not be abrogated 'by imputing to Congress a decision which quite clearly it has not undertaken to make.'").

In the appeal opinion of <u>St. Paul Fire and Marine Ins. Co. v. Cox</u>, 752 F.2d 550, 552 (11th Cir. 1985), the Eleventh Circuit stated that "the fact that the appellant (defendant) in this case was convicted of criminal conduct militates more strongly in favor of the application of the equitable principle that a wrongdoer should not profit from his misdeeds."

Although the conduct of defendants in the case at bar is not criminal, by analogy the <u>St. Paul</u> reasoning applies: wrongdoers should not profit from their actions. The behavior of defendants amounted to constructive fraud,[34] fraudulent because

---

[34]  Constructive fraud denotes "forms of unintentional deception or misrepresentation that are held to be fraudulent." Bryan A. Garner, A Dictionary of Modern Legal Usage (2d ed. 1995).  Henry Campbell Black, Black's Law Dictionary (6th ed. 1990), goes further to state the following:  Breach of legal or equitable duty which, irrespective of moral guilt, is declared by

it deceived plaintiffs into detrimentally believing that late premium payments were acceptable.  Defendants, who were **unjustly enriched** to the extent that they did not have to pay medical bills after having accepted premium payments and having misled plantiffs, are estopped by their behavior from claiming strict interpretation of the policies.  The principle of constructive fraud applies.

This holding adheres to Alabama law, the law of our neighboring state Florida, and the law of this circuit.  In Murmanill Corporation v. Simpkins, 251 F.2d 33, 35 (5th Cir. 1958),[35]  the court held "that to allow plaintiff to profit by his own wrong ... would result in a wholly unjust enrichment to him, in fact in constructive fraud."  The Murmanill court went on to quote the following passage from Corpus Juris Secundum:

> "The clean hands maxim is cognate with numerous other principles which equity invokes in refusing relief to wrongdoers * * * a right cannot arise to anyone out of his own wrong; no one should be permitted to profit by, or take advantage of, his own wrong."  30 C.J.S. Equity § 94. pp 477-478.

---

law to be fraudulent because of its tendency to deceive others or violate confidence."  It is "fraud that arises by operation of law from conduct, which if sanctioned by law, would secure an unconscionable advantage."  37 C.J.S. § 5.  Constructive Fraud (1997).

[35]  The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981, in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Citing authorities, including Williston on Contracts, Rev. Ed. §§ 1293 & 1293(a) Vol. 5. "Implied promise not to prevent or hinder performance," the Murmanill court further opined that a contracting party impliedly obligates himself to cooperate in the performance of a contract.  "'[T]he law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove."  251 F.2d at 35.  In the instant case defendants are attempting to take advantage of the obstacle they placed in the way of plaintiffs' performance of their contracts: canceling the policies for nonpayment of premiums after having misled the plaintiffs by customarily accepting late premium payments from them.

In Bell v. Smith, 32 So. 2d 829, 832 (Fla. 1947), the Florida Supreme Court, in ruling a constructive trust was in effect, stated the following:

> It is well recognized legal maxim that for every wrong there is a remedy, and it therefore follows that where one by fraud and deception has procured property or a thing of value, equity and good conscience require that he who commits such fraud shall be required to account to the person or persons whom his wrong has injured and that he may not hold the property so acquired and be enriched there by to the detriment of those who have been deprived of a substantial right as a result of his fraudulent act or misrepresentation.
> . . .
>
> In 54 Am. Jur., Sec. 219, page 169, it is said:
> 'As Remedy against Unjust Enrichment.--A constructive trust is substantially an appropriate remedy against unjust enrichment.  It is raised by

52

equity in respect of property which has been acquired
by fraud, or where although acquired originally without
fraud, it is against equity that it should be retained
by the person holding it.

Alabama has adopted the following standard for a
constructive trust:  "[T]he standard stated by this court for
determining to impose a constructive trust, in the absence of
fraud, makes it clear that, in that context, the purpose of a
constructive trust is to prevent any *legally significant* unjust
enrichment."  Brothers v. Fuller, 607 So. 2d 135, 137 (Ala.
1992).  In the instant case to allow defendants' escape from
liability at this date by adherence to the "plan," rather than by
finding liability on plaintiffs' reliance on formal written
interpretations of that "plan" by monthly premium notices,
certainly rises to the level of "*legally significant* unjust
enrichment" invoking the doctrine of equitable estoppel.

In Glass v. United of Omaha Life Ins. Co., 33 F.3d
1341, 1347 (11th Cir. 1994), the court espoused its common law
equitable estoppel doctrine in the following manner:

> In the Eleventh Circuit we have created a very
> narrow common law doctrine under ERISA for equitable
> estoppel when (1) the provisions of the plan at issue
> are ambiguous, and (2) representations are made which
> constitute an oral interpretation of the ambiguity.
> *See Kane v. Aetna Life Inc.*, 893 F.2d 1283, 1285-86
> (11th Cir. 1990).
>
> . . .
>
> Estoppel exists when the conduct of one party has
> induced the other party to take a position that would
> result in harm if the first party's acts were

> repudiated.  *See Pitts by and Through Pitts v. American*
> *Security Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.
> 1991).

The <u>Glass</u> court decided there was no estoppel claim because there
was no detrimental reliance--a necessary element.  In the case at
bar there was detrimental reliance, which not only created an
estoppel, but resulted in formation of a constructive trust.

Significantly, the <u>Pitts</u> decision, referenced above,
went further by saying, in part:

> [E]stoppel involves some element of reliance or preju-
> dice on the part of the insured before an insurer is
> foreclosed from raising a ground for denial of liabil-
> ity that was known at an earlier date.

Defendants are not excluded from the two exceptions
recognized by the Eleventh Circuit, cited above.  It was the
defendants themselves who created **in writing**, the ambiguities by
sending ambiguously written premium notices, ambiguities which
should carry more weight than orally created ones recognized by
the circuit.  Reasonable persons could disagree as to the meaning
and effect of the interpretative notices which fulfilled the
elements of equitable estoppel as defined by federal common law:

1)   Defendants misrepresented material facts pertain-
     ing to the due date of the premiums;

2)   Plaintiffs were unaware that the December 1, 1994,
     due date represented in the premium notices was
     not accurate;

3)   Defendants had reason to believe that the plain-
     tiffs would rely on the December 1, 1994, due
     date;

4)   Plaintiffs did not know, nor should have known, based on past dealing with defendants, the true facts; and

5)   Plaintiffs reasonably and detrimentally relied on the misrepresented December 1, 1994, due date on the premium notices.

Furthermore, in carrying the analysis a step further, if this fact situation is indeed covered by ERISA, the court holds that the "plan" was amended by administrator IAC with each formal, written premium notice sent.  Section 402(b)(3) provides that "[e]very employee benefit plan ... shall provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan."  Smith v. National Credit Union Admin. Bd., 36 F.3d 1077, 1081 (11th Cir. 1994), held that "any modification or amendment to an ERISA plan can be implemented or applied only *after* the amendment has been appropriately adopted in a formal, complete and written form."  As agent of Congress IAC had "authority to control and manage the operation and administration of the plan," 29 U.S.C.A. § 1102(a)(1), and did in fact do so from the inception date of the Massey policies, the Masseys dealing only with IAC after the policies were written.

It is immaterial that there was no apparent amendment procedure to the "plan."  "[T]he majority of courts have held that a failure to provide amendment procedures does not invalidate a plan amendment unless the plan participants can show detrimental reliance based on the employer's failure to comply

with § 402(b)." Aldridge v. Lily-Tulip, Inc. Salary Retirement Plan Benefits Committee, 40 F.3d 1202, 1211 (11th Cir. 1994) cert. denied, ___ U.S. ___, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).[36] Aldridge held that the primary purpose of section 402 "is to ensure that the interested parties may determine, at any time, their benefits under the plan." Id. Only by holding that the premium notices sent were amendments to the plan can the rights of the beneficiaries (Masseys) be protected. They relied on the decision of the plan administrator set forth in the formal, written amendments (premium notices) determining amounts owed, premium due dates, and termination dates of their policies --factual findings of the ERISA plan administrator. See Paramore v. Delta Air Lines, Inc., 129 F.3d 1446 (11th Cir. 1997) ("[W]here the plan affords the administrator discretion, the administrator's factbased [sic] determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered."). The Masseys relied on the formal, written amendments of the plan (premium notices) they received from IAC acting in its capacity of plan administrator implementing the provisions of the poli-cies.

The court holds that each premium notice was a separate amendment of the plan, fulfilling the principal object of ERISA:

--------------------------------------------

[36] Such was not the case here. Indeed, it was the opposite.

"to protect plan participants and beneficiaries." Boggs v.
Boggs, ___ U.S. ___, ___, 117 S. Ct. 1754,1762, 138 L. Ed. 2d 45
(1997), reh'g denied, 118 S. Ct. 9, 138 L. Ed 2d 1043 (1997).
(Object recognized by our circuit in Hunt v. Hawthorne Associ-
ates, Inc., 119 F.3d 888, 911 (11th Cir. 1997), reh'g and
suggestion for reh'g en banc denied 131 F.3d 157 (11th Cir.
1997). The premium notices amended the ERISA plan the same way
it was created (in writing but without the full formality of a
plan intentionally created). The "plan's" creation was by
written proposal accepted by plaintiffs. So were the amendments.
There is, therefore, no reason to apply the limitations of the
Eleventh Circuit estoppel rule. The writings formed valid
amendments to the plan.

VI.

For the reasons set forth above the court holds the
following:

1)   There was no ERISA "plan" established for the
benefit of employees of MAI;

2)   As the sole owners of MAI the Massey brothers are
exempt from ERISA provisions;

3)   The insurance policies purchased by the Massey
brothers did not constitute an ERISA plan;

4)   The doctrine of equitable estoppel mandates
Congress is estopped from pleading ERISA by its
representation that ERISA did not apply;

5)   After having accepted payment of late premiums
defendants had a duty to notify plaintiffs they would
no longer follow the practice before canceling their
policies for nonpayment;

57

6)   Because of ambiguities in the premium notices the ambiguities are construed against the drafter;

7)   Because of ambiguities in the premium notices premiums were due December 1, 1994, and plaintiffs had a 31 day grace period in which to pay the premiums;

8)   By typing in the second due date in the premium notice defendants waived the claim to the earlier due date;

9)   Payment of policy premiums on December 5, 1994, was within the grace period and was timely;

10)   Defendants breached the simple contract, the contract by estoppel, and the section 90 contract with plaintiffs by canceling the policies;

11)   Defendants breached a special duty they had to James Massey by unconscionably canceling his policy while he was suffering from a terminal illness and while there were sufficient sick benefits to pay his premiums;

12)   Plaintiffs are due summary judgment as a matter of law on the breach of contract claim;

13)   Defendants are due summary judgment as a matter of law on the claims for outrage, negligence, and bad faith;

14)   Defendants are to reinstate the policies and pay insurance claims that have accumulated since the cancellation of the policies;

15)   Plaintiffs are to pay the premiums on their health insurance policies, with defendants applying policy proceeds toward payment if necessary;

16)   Defendants are prohibited from canceling the medical policy of James D. Massey prior to the time all of the benefits have been paid for his terminal renal disease pursuant to the limits of the policy.

17)   The affidavit of David H. Roberts is stricken.

18)   Paragraphs 12 in the affidavits of James D. Massey and Robert A. Massey are stricken since they contra-

dict, without explanation, their deposition testimony;
and

19)   The motion to strike the jury demand is denied
since the court has ruled this is not an ERISA case.

In the alternative, **only if** it is held by the circuit

on appeal that ERISA applies, the court holds the following:

1)   Because of the "*legally significant* unjust
enrichment" of defendants a constructive trust is
declared created;

2)   Defendants amended the ERISA plan with each
premium notice sent in the same way the plan was
created--in writing but without the full formality
of a plan intentionally created;

3)   The doctrine of equitable estoppel as applied
to ERISA cases estops defendants from
canceling plaintiffs' policies;

3)   Pursuant to St. Joseph's plaintiffs are entitled
to damages, attorneys' fees, costs, prejudgment
interest, and injunctive relief, said application
for attorneys' fees, costs, and prejudgment
interest to be determined at the completion of
these proceedings;

4)   Defendants are to reinstate the policies and pay
insurance claims that have accumulated since the
cancellation of the policies;

5)   Plaintiffs are to pay the premiums on their health
insurance policies, with defendants applying
damages toward payment, if necessary; and

6)   Defendants are prohibited from canceling the
medical policy of James D. Massey prior to the
time all of the benefits have been paid for his
terminal renal disease pursuant to the limits of
the policy.

An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED this 22ᴺᴰ day of June 1998.



UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

60